# JOHN F. O'BRIEN *v.* SUPERIOR COURT, JUDICIAL DISTRICT OF HARTFORD
## (AC 26361)

DiPentima, McLachlan and Peters, Js.

Argued September 19, 2007—officially released February 12, 2008

*John F. O'Brien*, pro se, the plaintiff in error.

*Peregrine Zinn-Rowthorn*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, *Gregory T. D'Auria*, associate attorney general, and *Philip Miller*, assistant attorney general, for the defendant in error.

*Opinion*

PETERS, J. The principal issue in this writ of error is whether the trial court properly disciplined a defense attorney who filed a postacquittal motion for a judicial inquiry into possible tampering with evidence consisting of a communication between his client and her prior counsel. The trial court faulted the attorney for persisting in his claim that the attorney-client privilege had not been waived at the criminal trial and for calling for a grand jury investigation without sufficient evidence to support a good faith belief of criminal misconduct by a governmental entity. Although we agree with the court's finding that the attorney violated rules 3.1 and 3.3 of the Rules of Professional Conduct, we do not agree with its findings that he violated rules 1.2 and 8.4. Therefore we deny the writ in part and grant it in part.

The plaintiff in error, John F. O'Brien (plaintiff), an attorney, filed a writ of error on December 23, 2003, to challenge the finding of the trial court, *Miano, J.*, that the plaintiff had violated rules 1.2, 3.1, 3.3 and 8.4 of the Rules of Professional Conduct, and to seek review of the sanctions imposed on him.[1] The trial court maintains that, after a hearing, it properly found, by clear and convincing evidence, that the plaintiff had failed to counsel his client properly, had filed a motion for investigation without a good faith belief that a crime had been committed by a government entity, had misstated the law and had engaged in conduct prejudicial to the administration of justice. The plaintiff's writ challenges both the court's underlying findings and the propriety of the sanctions imposed on the plaintiff.

The record discloses the following relevant facts and procedural history. From June 25 to July 9, 2003, the plaintiff was trial counsel for T,[2] whom the state had charged with two counts of custodial interference in the first degree; see General Statutes § 53a-97;[3] because of her unauthorized removal of her children from this state. T's turbulent relationship with her former spouse was a recurring theme at the trial.

---

[1] The writ of error was properly filed in our Supreme Court and was transferred by that court to this court. The writ of error is properly before us, as the plaintiff is an aggrieved nonparty to a final judgment; see *State* v. *Perez*, 276 Conn. 285, 288 n.2, 885 A.2d 178 (2005); *Briggs* v. *McWeeny*, 260 Conn. 296, 311–13, 796 A.2d 516 (2002); Practice Book § 72-1; and therefore does not have access to a remedy by way of an appeal.

[2] In accordance with the spirit and intent of General Statutes § 54-142a, the name of the acquitted defendant is not disclosed in this opinion.

[3] General Statutes § 53a-97 provides in relevant part: "(a) A person is guilty of custodial interference in the first degree when he commits custodial interference in the second degree as provided in section 53a-98: (1) Under circumstances which expose the child or person taken or enticed from lawful custody or the child held after a request by the lawful custodian for his return to a risk that his safety will be endangered or his health materially impaired; or (2) by taking, enticing or detaining the child or person out of this state."

During the state's cross-examination of T on July 1, 2003, the prosecutor, assistant state's attorney David L. Zagaja, asked T if she recalled having communicated with one of her former attorneys about her "desires" in her dissolution action. T responded: "There were numerous communications. I don't know what you're referring to." The prosecutor then asked T, while reading from a document: "Do you recall telling [your attorney], 'now that I have a boyfriend with more money than him at First Financial Resources in Topsfield, [Massachusetts], I want to take all his money and leave him with nothing. No house, no kids, no money, after f___ing all of Singapore.' Do you recall communicating that to [your attorney]?" T responded: "No, that was definitely not my communication to her. That—those are [my former husband's] words." The prosecutor then disclosed that he had been reading from a copy of an e-mail communication, dated January 29, 1999, between T and her former attorney in her dissolution action.

Upon reviewing the document, T confirmed that it was a communication with her former attorney, but continued to insist that she was not the declarant of the passage that the prosecutor had read aloud. She opined: "There's some piece here missing or something. I don't know why . . . I don't know if [my attorney] cut in between something . . . ." The prosecutor then offered the e-mail into evidence and provided T's attorney, the plaintiff here, with an opportunity to examine it. After the examination, the plaintiff informed the court that he had "[n]o objection" to its admission. The court then entered the document into evidence as state's exhibit eleven.

On the next day of trial, during the plaintiff's redirect examination of T, the plaintiff, for the first time, described state's exhibit eleven as a "confidential, privileged message" between T and her former attorney. Noting that the plaintiff had not protested the entry of

the document into evidence on the previous day, the prosecutor immediately objected to this characterization. In response, the plaintiff withdrew the question.

T then testified that, upon looking through her records the previous evening, she had found an original copy of state's exhibit eleven. This copy, entered into evidence as defendant's exhibit F, plainly demonstrated that several lines of text were missing from the state's version of the e-mail, resulting in a gap in the communication immediately preceding the vitriolic passage that had been quoted in court the day before. T testified that exhibit F, by filling in the gap, demonstrated that she had been reciting her former husband's words to her attorney, rather than declaring them as her own position. At this juncture, no question was raised by either counsel or by the court as to who had redacted the e-mail or how it had come into the state's file.

On July 9, 2003, after T's acquittal of the criminal charges against her, she directed the plaintiff "to move the [trial] court to make an inquiry into exactly how the state's attorney came to possess the document that he introduced as Exhibit [eleven] in the trial . . . and who altered it . . . ."[4] The plaintiff made an oral motion for the court to apply for an investigation[5] and then

---

[4] T declared in her July 16, 2003 affidavit that she had directed the plaintiff to move for an inquiry.

[5] In response to the plaintiff's oral motion, the court immediately inquired whether it was within its purview to order an investigation. In reply, the plaintiff cited General Statutes § 54-47c, as well as canons I, II and III of the Code of Judicial Conduct.

General Statutes § 54-47c provides in relevant part: "(a) Any judge of the Superior Court, Appellate Court or Supreme Court, the Chief State's Attorney or a state's attorney may make application to a panel of judges for an investigation into the commission of a crime or crimes whenever such applicant has reasonable belief that the administration of justice requires an investigation to determine whether or not there is probable cause to believe that a crime or crimes have been committed."

General Statutes § 54-47b provides in relevant part: "For the purposes of sections 54-47a to 54-47h, inclusive . . . (2) 'Crime or crimes' means (A) any crime or crimes involving corruption in the executive, legislative or

filed a written motion entitled, "Motion for the Court's Application for an Investigation." The written motion alleged that exhibit eleven was "[a] [n]ever previously disclosed by the state to the defendant or her trial counsel that the state possessed the privileged document and intended to use it against her at trial; [b] [a]bsolutely protected by the unwaived attorney-client privilege, between the defendant and her former divorce attorney . . . [c] [u]nlawfully and/or unethically obtained by the state without the defendant's knowledge or consent; and [d] [a]ltered and fabricated in a substantial, material and prejudicial manner by the deletion or redaction of an entire paragraph of material text from the first page." Although the motion primarily called on the court to apply for an investigation pursuant to General Statutes § 54-47c,[6] it also requested that

judicial branch of state government or in the government of any political subdivision of the state . . . ."

Canon 1 of the Code of Judicial Conduct provides: "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."

Canon 2 (a) of the Code of Judicial Conduct provides: "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Canon 3 (b) (3) of the Code of Judicial Conduct provides in relevant part: "A judge should take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware."

[6] The plaintiff moved the court to find that "the administration and interests of justice as well as the integrity of the judicial process require that [the court] make application to or for a panel of judges of the Superior Court to investigate the apparent commission of ethical violations and of a crime, to wit, [t]ampering with or fabricating physical evidence, in violation of Section 53a-155, C.G.S., as amended, a Class D felony . . . ."

General Statutes § 53a-155 provides in relevant part: "(a) A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding; or (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to

the court "take any other measures it deems in accord with law and prudence to protect the integrity of the Court and the judicial process."

On July 11, 2003, the trial court conducted its first hearing on the plaintiff's motion. The court faulted the plaintiff for his failure to file affidavits in support of his motion and ordered him, and the prosecutor, to fill this procedural gap. Anticipating what these affidavits might contain, the court divided the plaintiff's motion into two specific assertions of misconduct: an alleged violation of the attorney-client privilege and a request for the court's filing of an application for an investigation under § 54-47c to inquire into possible evidence tampering. With respect to the first assertion, the plaintiff admitted that he was unprepared to argue the attorney-client privilege claim. With respect to the second, the plaintiff expressly acknowledged that an application for a § 54-47c investigation would be unwarranted if the prosecutor were to submit an affidavit demonstrating that he had received state's exhibit [eleven] in its altered state.[7]

The affidavits subsequently submitted by the prosecutor and the plaintiff disagreed about the provenance of exhibit eleven. The prosecutor's affidavit asserted that he had received exhibit eleven in its redacted version from T's former husband on June 20, 2003, and that he had represented finding the e-mail in the former

mislead a public servant who is or may be engaged in such official proceeding."

[7] The following colloquy took place:

"The Court: But see, I am in the dark here. What if it came—if it came from the outside to [the prosecutor] in that fashion. I realize [you're] claiming it is still attorney-client, but let me just say about the tampering business.

"[The Plaintiff in Error]: That is the answer then, Your Honor. That's the answer. Then, let the state provide an affidavit to Your Honor that we received it in such a fashion. . . . And then the whole matter—the whole matter is arguably finished, except for the person who provided a tampered document to the state's attorney."

marital residence after T had vacated it on May 4, 2000. The affidavits filed by the plaintiff and T denied that T had left any communication with her attorney at the family residence and surmised that someone other than her former husband had altered the e-mail. The plaintiff's affidavit also reiterated his contention that the e-mail was "privileged" and confidential.[8]

On September 17, 2003, the trial court issued its memorandum of decision denying the plaintiff's motion for an investigation. With respect to the alleged violation of the attorney-client privilege, the court ruled that, even if the contents of exhibit eleven had fallen within the privilege, the plaintiff and T had waived the privilege by failing to claim it when the e-mail was first introduced into evidence. With respect to the request for a § 54-47c investigation, the court ruled that "no valid reasons" and "no empirical facts" had been presented that would afford the court "a reasonable belief that the assistant state's attorney [or] any other attorney or member of a governmental agency either [had] violated a privilege or had knowledge of, or participated in, the purported deletion of the subject five lines from state's exhibit [eleven]."

The court then initiated the proceedings that gave rise to the present writ of error. The court stated that "inasmuch as counsel for the acquitee has made no effort to even articulate some semblance of a basis for either claim, the question then becomes one of whether counsel has made his claims in good faith and has

---

[8] In addition, the plaintiff outlined a chain of custody for T's dissolution communications, stating that they were "apparently in the possession of [T's] past [dissolution] lawyers and ultimately her public defenders in this case until June 30, 2003, when all of her [dissolution] file papers were given over to me by the public defenders." Subsequently, in the plaintiff's reply to the court's preliminary memorandum of decision, he clarified that the date that he had received these files was actually June 20, 2003, as opposed to June 30.

honored his obligations to the court." The court concluded it had "reason to believe" that the plaintiff had violated rules 1.2, 3.1, 3.3 and 8.4 of the Rules of Professional Conduct and issued an order continuing the matter to provide the plaintiff an opportunity to be heard as to whether sanctions should be imposed.

On November 6, 2003, the plaintiff filed a "Reply to Memorandum of Decision and Motion Not to Impose Sanctions," in which he averred that he had filed his postacquittal motion in good faith and that he lacked any malicious or improper motives. Nonetheless, he continued to refer to exhibit eleven as a "privileged communication." Relying on that characterization, he faulted the prosecutor for failing to inquire into the origins of the altered exhibit and opined that the prosecutor had an ethical duty to disclose its existence to the defense before introducing it into evidence at T's criminal trial. At the same time, he repeated that "[n]either [T] nor I accuse any particular person of wrongdoing in connection with state's exhibit [eleven] . . . because we have absolutely no evidence surrounding this document except that which is presented in the subject motion, in argument and in this memorandum."

On December 9, 2003, after a second hearing, the trial court, unpersuaded by the plaintiff's reply,[9] imposed sanctions on the plaintiff. Incorporating by reference its findings in its September 17, 2003 memorandum of decision,[10] the court recited the relevant procedural

---

[9] The court stated, "It is the opinion of the court that nothing presented in counsel's reply supports counsel's petition not to impose sanctions. In fact, the contents of the reply corroborate, to a substantial degree, the court's findings of violations of Rules of Professional Conduct §§ 1.2, 3.1, 3.3 and 8.4."

[10] The court found the following: Exhibit eleven was a copy of an e-mail wherein T was relating to her divorce attorney what T's former husband had said in a therapy session. When the prosecutor offered exhibit eleven at trial, the plaintiff did not object to its admission, did not ask to examine the document, did not claim failure of discovery compliance and did not claim the document was incomplete, misleading, privileged or otherwise objectionable. During redirect examination, the plaintiff introduced defense

history and concluded that the plaintiff's filing of the motion had violated four of the Rules of Professional Conduct, warranting the imposition of sanctions. The court held that the plaintiff (1) had violated rule 1.2 by calling for an investigation in response to the wishes of his client in derogation of his professional obligations as an officer of the court, (2) had violated rule 3.1 by making frivolous assertions without any good faith basis for his claims, (3) had violated rule 3.3 (a) (1), which requires candor toward the tribunal, by his "concerted effort not to know the status of the law" regarding attorney-client privilege and (4) had violated rule 8.4 by pursuing claims on behalf of his client that improperly insinuated wrongdoing by the office of the state's attorney.

I

The plaintiff challenges the validity of each of the court's criticisms of the legitimacy of his filing of his motion for a judicial investigation into the prosecutor's introduction of exhibit eleven at his client's trial. Before we address each of the plaintiff's individual claims, we must identify the standards that govern our appraisal of his writ of error.

It is fundamental that "[t]he Superior Court possesses inherent authority to regulate attorney conduct and to discipline the members of the bar." *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn. 510,

exhibit F, a more complete version of the e-mail, which showed that five lines had been missing from the exhibit eleven version. T's criminal trial ended when the jury returned a verdict of not guilty on all counts. Thereafter, the plaintiff initiated a motion, claiming the attorney-client privilege protected the contents of the e-mail from disclosure and that violations were inherent in the possession and proffer of the subject document by the state, claiming that there was no waiver of the attorney-client privilege relevant to exhibit eleven at the time of trial and claiming that prior to its admission into evidence, the e-mail was tampered with or fabricated by person or persons unknown in violation of General Statutes § 53a-155.

523, 461 A.2d 938 (1983). "[Courts] may of their own initiative, and without complaint, set on foot inquiries as to professional conduct and fitness . . . ." *In re Peck*, 88 Conn. 447, 457, 91 A. 274 (1914). Nonetheless, although "the power of the courts is left unfettered to act as situations, as they may arise, may seem to require, for efficient discipline of misconduct"; id.; "in a matter involving attorney discipline, no sanction may be imposed unless a violation of the Rules of Professional Conduct has been established by clear and convincing evidence." *State* v. *Perez*, 276 Conn. 285, 307, 885 A.2d 178 (2005). "[C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) Id., 307–308, quoting *Somers* v. *Statewide Grievance Committee*, 245 Conn. 277, 290–91, 715 A.2d 712 (1998).

The standard of review that governs a writ of error in which an attorney disputes a trial court's disciplinary order similarly is well established. "[O]ur role is limited to reviewing the record to determine if the facts as found are supported by the evidence contained within the record and whether the conclusions that follow are legally and logically correct." (Internal quotation marks omitted.) *Machado* v. *Statewide Grievance Committee*, 93 Conn. App. 832, 837, 890 A.2d 622 (2006); see also *Smith* v. *Muellner*, 283 Conn. 510, 517, 932 A.2d 382 (2007). In conducting our review, we must decide whether the trial court's conclusion is supported by clear and convincing evidence; *Briggs* v. *McWeeny*, 260

Conn. 296, 322–23, 796 A.2d 516 (2002); mindful that "[t]he weight to be given to the evidence and to the credibility of witnesses is solely within the determination of the trier of fact." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Dixon*, 62 Conn. App. 507, 511, 772 A.2d 160 (2001).

Guided by these principles, we will divide our review of the plaintiff's challenges to the court's decision into three parts. We will first consider his claims with respect to the court's decision finding him in violation of rules 3.1 and 3.3 because of his persistent reiteration of his argument that state's exhibit eleven was inadmissible into evidence because it was a document protected by the attorney-client privilege. We will then consider his claims with respect to the court's decision finding him in violation of rules 1.2 and 8.4 because of his request for a judicial investigation into the alteration of the communication between his client and her former counsel that came into evidence as state's exhibit eleven. Finally, we will address the propriety of the sanctions imposed on the plaintiff by the court.

II

We begin our analysis of the merits of the plaintiff's writ of error by addressing the trial court's disciplinary findings with respect to his invocation of the attorney-client privilege. The court found that, in ignoring settled law, the plaintiff violated rule 3.1 because he lacked a good faith basis for his claim that exhibit eleven was protected by an "unwaived attorney-client privilege." In addition, the court found that the plaintiff violated rule 3.3 (a) (1) because his persistence in ignoring the undisputed law of attorney-client privilege demonstrated "a lack of candor with the court." We agree with both of these findings.

A

## Rule 3.1

Rule 3.1 prohibits an attorney from filing frivolous claims. As of 2003, the rule provided in relevant part: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous . . . ."[11] Rules of Professional Conduct (2003) 3.1. In *Texaco, Inc.* v. *Golart*, 206 Conn. 454, 464, 538 A.2d 1017 (1988), our Supreme Court concluded that an "action is frivolous . . . if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law."[12] (Internal quotation marks omitted.)

The objective "reasonable attorney" standard governs the determination of whether a lawyer's claim is frivolous. See *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 255, 828 A.2d 64 (2003); *Brunswick* v. *Statewide Grievance Committee*, 103 Conn. App. 601, 615, 931 A.2d 319, cert. denied, 284 Conn. 929, 934 A.2d 244 (2007); 2 G. Hazard & W. Hodes, The Law of Lawyering (3d Ed. Sup. 2007) § 27.12 ("[r]ule 3.1 adopts an objective as opposed to a subjective standard"); 2 Restatement (Third), Law Governing Lawyers § 110, comment (d), p. 172 (2000) ("frivolous position is one that a lawyer of ordinary competence would recognize as so lacking in merit that there is no substantial possibility that the tribunal would accept it"). In addition, we recently have recognized that, although a claim need

---

[11] In an amendment that took effect January 1, 2007, the phrase "in law and fact" was added to the sentence, following the phrase "unless there is a basis."

[12] The commentary to rule 3.1 states that attorneys are required to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions." Rules of Professional Conduct 3.1, commentary.

not be based on fully substantiated facts when filed, once it becomes apparent that the claim lacks merit, an attorney violates rule 3.1 by persisting with the claim, rather than withdrawing it. *Brunswick* v. *Statewide Grievance Committee*, supra, 619 ("rule 3.1 prohibits an attorney from asserting . . . a claim on which the attorney reasonably is unable to maintain a good faith argument on the merits").

The trial court concluded that the plaintiff's repeated assertion that exhibit eleven was "absolutely protected by the unwaived attorney-client privilege" violated rule 3.1 because the plaintiff ignored settled law that an attorney's failure to make a timely objection to the admission of a document is a waiver of the privilege. We agree with the court that even a modicum of legal research would have informed the plaintiff that his belated assertion of the privilege was frivolous.

"The power to waive the attorney-client privilege rests with the client or with his attorney acting with his authority. 1 C. McCormick, Evidence (4th Ed. 1992) § 93, p. 341; see also *Doyle* v. *Reeves*, 112 Conn. 521, 523, 152 A. 882 (1931) . . . . [I]f the holder of the privilege fails to claim his privilege by objecting to disclosure by himself or another witness when he has an opportunity to do so, he waives his privilege as to communications so disclosed. 1 C. McCormick, supra, § 93, p. 343. This result is reached because once the confidence protected has been breached, the privilege has no valid continuing office to perform." (Internal quotation marks omitted.) *Gebbie* v. *Cadle Co.*, 49 Conn. App. 265, 274, 714 A.2d 678 (1998).[13]

---

[13] Failure of a defense attorney to object to the introduction of arguably privileged evidence also raises an inference that the attorney did not view the matter as seriously prejudicial at the time of its introduction. See *State* v. *Andrews*, 248 Conn. 1, 19–20, 726 A.2d 104 (1999) ("defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time"); see also *State* v. *Colon*, 272 Conn. 106, 245, 864 A.2d 666 (2004) ("defense counsel did not object to this line of questioning

In the absence of any dispute about the underlying facts, we conclude that the trial court properly found, by clear and convincing evidence, that the plaintiff violated rule 3.1 of the Rules of Professional Conduct. The plaintiff's continued assertion of an attorney-client privilege that he had waived was inexcusable and unprofessional.

## B

### Rule 3.3 (a) (1)

Rule 3.3 requires an attorney to act with candor toward the tribunal. As of 2003, the rule stated in relevant part: "(a) A lawyer shall not knowingly: (1) Make a false statement of material fact or law to a tribunal . . . ."[14] Rules of Professional Conduct (2003) 3.3. The commentary to rule 3.3 provides: "Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities."[15] Rules of Professional Conduct 3.3, commentary. The commentary also states: "There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." Id.; see also *McCoy* v. *Court of Appeals of Wisconsin*, 486 U.S. 429, 441 n.14, 108 S. Ct. 1895, 100 L. Ed. 2d 440 (1988).

. The trial court found that the plaintiff had violated rule 3.3 by "making the claim of attorney-client privilege and yet, apparently, making no effort to review the

at trial on the basis of the attorney-client privilege, suggesting that he did not view the line of questioning to be seriously prejudicial at the time"), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

[14] In 2007, the word "material" was deleted from the phrase.

[15] Another provision of rule 3.3 specifically targets a knowing failure to disclose legal authority. Rules of Professional Conduct 3.3 (a) (3) (2003), now rule 3.3 (a) (2), provides: "A lawyer shall not knowingly . . . [f]ail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel . . . ."

applicable law at the time the issue arose and counsel filed the pleadings." The court focused on the plaintiff's "persistent assertions of the inadmissibility of state's exhibit eleven despite counsel's failure to object to its admissibility . . . ."

The plaintiff cannot and does not disagree with the trial court's description of his repeated representations about the validity of his attorney-client privilege representations at trial. Despite his own failure to object to the admission of exhibit eleven into evidence, he again and again faulted the prosecutor for having violated T's attorney-client privilege.[16]

The plaintiff defends his persistence in his claim of privilege by arguing that his waiver of the privilege was ineffective because it was not voluntary and intelligent. He argues that, until T discovered the original e-mail between herself and her dissolution counsel, he did not have an opportunity properly to appraise the admissibility of exhibit eleven. We are not persuaded. As the trial court points out, before the prosecutor moved for admission of exhibit eleven into evidence, he elicited from T the fact that the exhibit was a communication with her attorney. The plaintiff was then shown a copy

---

[16] At the initial hearing, the trial court admonished the plaintiff that his claim of privilege was baseless in light of *Doyle* v. *Reeves*, supra, 112 Conn. 521, but invited the plaintiff to brief the issue. Instead of doing so, the plaintiff continued to make unsupported assertions. In his July 16, 2003 affidavit he stated, "I am informed and believe that the document marked as state's Exhibit [eleven] . . . represents privileged and confidential electronic correspondence between [T] and her former attorney . . . ." In his November 6, 2003 reply, he argued, without citing to any authority, that his failure to object to the introduction of exhibit eleven did not constitute a voluntary waiver, thereby preserving the privilege until it was waived by the subsequent introduction into evidence of the complete e-mail. In the writ of error to this court, the plaintiff continues to provide no legal basis to his original claim, and offers no challenge to the factual basis of the court's memoranda, other than the bald assertion that "[t]he court's reliance on the plaintiff's failure to object . . . is misplaced and evades the undisputed dynamics of that event."

of the exhibit and expressly stated that he had no objection to its admission. Even now, the plaintiff has not identified the further information that he would have needed to enable him to ascertain the exhibit's privileged status in timely fashion.

On this state of the record, we must uphold the trial court's finding that the plaintiff's knowing and unjustifiable persistence in misrepresenting the law constituted a lack of candor with the court that justified the imposition of sanctions under rule 3.3 of the Rules of Professional Conduct. The plaintiff's personal belief that the facts of record permitted an argument that he had not waived the privilege was never buttressed by a single citation of supporting authority.[17] The trial court's finding, therefore, was supported by clear and convincing evidence. See *Briggs* v. *McWeeny*, supra, 260 Conn. 322–23.

### III

We turn now to the trial court's determination that, by filing a motion for judicial investigation into the circumstances that permitted an altered document to be admitted into evidence at T's criminal trial, the plaintiff violated rules 1.2 and 8.4 (4) of the Rules of Professional Conduct. The trial court found that the plaintiff violated rule 1.2 because he did not make his request in his own capacity as an officer of the court. The court found that the plaintiff violated rule 8.4 (4) by pursuing claims on behalf of his client that improperly insinuated wrongdoing by the office of the state's attorney. We address each violation in turn.

---

[17] Indeed, it was only in the plaintiff's reply to the court's memorandum of decision that he very belatedly conceded that the privilege might not have attached to exhibit eleven. Even therein, however, he persisted in arguing that no waiver occurred until the introduction of defense exhibit F into evidence the following day.

A

## Rule 1.2

Rule 1.2 concerns the scope of representation and allocation of authority between the client and the lawyer. In 2003, rule 1.2 (e) required a lawyer to advise the client about limitations on the lawyer's conduct that are contained in the Rules of Professional Conduct or other law.[18] The commentary to rule 1.2 stated in relevant part that "a lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so." Rules of Professional Conduct (2003) 1.2, commentary. The trial court found that, in asking for an investigation into the auspices of state's exhibit eleven, the plaintiff had acted, not as an officer of the court, but out of "a desire to fulfill [T's] wishes and a complete abandonment of any duty whatsoever to the court." Faulting the plaintiff for having moved for a judicial inquiry without any factual support for his allegations of official misconduct, the court found that the plaintiff lacked a good faith basis for his challenge to the integrity of the judicial process.

The court's finding of professional ineptitude on the part of the plaintiff cannot be faulted. It is clear that the plaintiff never presented, either orally or in his affidavits, sufficient evidence for the court to have had a reasonable belief that a government entity had altered the e-mail between T and her dissolution attorney. He repeatedly acquiesced in the court's exoneration of the state's attorney[19] and acknowledged the difficulties inherent in his invocation of § 54-47c without citing an

---

[18] See Rules of Professional Conduct (2003) 1.2 (e). In 2007, subsection (e) was deleted from rule 1.2. We cite subsection (e) and the commentary because the trial court referred to these sources in finding that the plaintiff had violated the rule.

[19] From the moment when the plaintiff initially called for an investigation, he stated that he did not believe that the prosecutor had altered the e-mail, and he reiterated this position throughout these proceedings.

alternate statutory or common-law route for the court to pursue.

It is not equally clear, however, that the plaintiff's failure to assist the court more fully in pursuing the inquiry that he himself had requested is clear and convincing evidence that the plaintiff did not act in good faith. The fact remains that, albeit inadvertently, the prosecutor introduced an altered document into evidence at T's criminal trial.[20] If T had not kept good records herself, the adverse inferences that a jury might have drawn from state's exhibit eleven might not have been rebutted. Unlike the circumstances before this court in *Brunswick* v. *Statewide Grievance Committee*, supra, 103 Conn. App. 601, in this case, *someone* brought to the prosecutor an altered document that was entered into court proceedings.[21]

Although the plaintiff's presentation of this vexing case left much to be desired, his complaint about the alteration of a crucial trial document must be placed within the proper context. Voicing a complaint about a fraud on the court was fully consistent with basic jurisprudential principles that undergird our judicial system. Unquestionably, the trial court has a "continuing obligation to see that no falsehood or fraud was perpetrated on the court." *LaBow* v. *LaBow*, 13 Conn. App. 330, 339, 537 A.2d 157, cert. denied, 207 Conn. 806, 540 A.2d 374 (1988). "A judge should participate in establishing, maintaining, and enforcing . . . high

---

[20] Although the court made a finding that there was "no basis whatsoever for . . . the claim . . . that the subject document was tampered with or fabricated, nor has any basis for this belief even been articulated by [the plaintiff]," the memorandum of decision, read in its entirety, makes it clear that the court was referring to a claim of tampering by the office of the state's attorney.

[21] The court hypothesized that the omission of certain lines from exhibit eleven might be attributable to the nature of e-mail correspondence. The court further noted that "the proponent of a communication is not required to put into evidence the complete communication."

standards of conduct so that the integrity and independence of the judiciary may be preserved." Code of Judicial Conduct, canon 1. An attorney admitted to practice in this state has taken an oath that he "will not knowingly allow anything dishonest to be done in court, and . . . will inform the court of any dishonesty of which [he has] knowledge . . . ." General Statutes § 1-25. These all-embracing commitments by the bench and bar are central to our system of justice. Furthermore, these principles have a statutory counterpart in General Statutes § 53a-155, which makes it a felony to destroy or to tamper with evidence while an official proceeding is pending.

We conclude, therefore, that the court's finding that the plaintiff violated rule 1.2 of the Rules of Professional Conduct because he did not act in good faith in seeking an investigation was not supported by clear and convincing evidence. Accordingly, we grant the writ of error as to this disciplinary finding.

B

Rule 8.4 (4)

Rule 8.4 provides that "[i]t is professional misconduct for a lawyer to . . . (4) Engage in conduct that is prejudicial to the administration of justice . . . ." The trial court again found that the plaintiff improperly had requested an investigation "to provide some answers for [T]." The specific grounds on which the court relied, however, were: "In counsel's motion and in argument before the court, counsel did insinuate wrongdoing by the office of the state's attorney. The state's attorney's office is not above reproach. However, these baseless claims did call into question the integrity of the state's attorney's office. There was significant media attention

given counsel's claims. This type of conduct by an experienced member of the bar is conduct that 'is prejudicial to the administration of justice.' "[22]

On the basis of these findings, the court concluded that the record demonstrated, by clear and convincing evidence, that the plaintiff lacked good faith in asking for an investigation into the circumstances leading to an introduction of state's exhibit eleven into evidence.[23] In the court's view, the plaintiff's failure to articulate legally viable grounds, coupled with what the court perceived to be an unprincipled attack on the integrity of the state's attorney's office, demonstrated that the plaintiff had abandoned his professional obligations to the court.

Standing by itself, the court's finding that the plaintiff lacked an evidentiary basis for accusing the prosecutor of misconduct cannot be faulted. Part of the plaintiff's original motion reasonably can be read to have implied that the state's attorney's office might have run afoul of ethical and legal norms. The plaintiff never presented a factual basis for a reasonable belief that a government entity had altered the e-mail. Furthermore, when the prosecutor furnished the court an affidavit unequivocally disclaiming any role in the alteration of exhibit

[22] We note that, in light of the plaintiff's violation of rules 3.1 and 3.3, the trial court also could have found a violation of subsection (1) of rule 8.4. Rule 8.4 provides: "It is professional misconduct for a lawyer to: (1) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another . . . ." In the court's imposition of sanctions, however, the court specifically relied on its finding of a rule 8.4 (4) violation. Academic commentators have identified a serious problem in the open textured provisions of rule 8.4 (4). "[Subsection four] raises the specter of a disciplinary authority creating new offenses by common law, and perhaps harassing an unpopular lawyer through selective enforcement . . . ." 2 G. Hazard & W. Hodes, supra, § 65.6.

[23] The trial court itself, in its questioning of the plaintiff, repeatedly recognized that the underlying issue was whether the plaintiff's request for an inquiry into the provenance of exhibit eleven had been made in good faith.

eleven, the plaintiff immediately should have withdrawn any semblance of a claim under § 54-47c, and he failed to do so.

The court's accurate recital of the record, however, attaches no significance to other undisputed facts of record. Although the plaintiff was unable to explain how the altered document that was entered into evidence as state's exhibit eleven came into the possession of the prosecutor, the record establishes unequivocally that the prosecutor *did* receive an altered document and *did* present the altered document in court. Albeit innocently, the prosecutor enabled *someone* to engage in fraudulent conduct that was prejudicial to our justice system.[24] The fortuity that a serious prejudice was avoided by T's conscientious recordkeeping does not negate the seriousness of what transpired in the courtroom on July 1, 2003.

The record, moreover, is replete with statements demonstrating that the plaintiff's request for an inquiry was not limited to his questioning of the role of the prosecutor in introducing exhibit eleven. Time and again, well in advance of the prosecutor's submission of his affidavit, the plaintiff stated that he would accept, without question, a statement from the prosecutor disclaiming any role in the alteration of the exhibit.[25] He acknowledged that § 54-47c might be inapplicable and implored the court to pursue any other course of inquiry that might be more appropriate.

Although the plaintiff was not as articulate an advocate of his position as one might have wished, the record shows that he was understandably taken aback by the

---

[24] There was no evidence at trial to support the trial court's surmise that the alteration in exhibit eleven was the result of computer error.

[25] From the moment when the plaintiff initially called for an investigation, he stated that he did not believe that the prosecutor had altered the e-mail, and he reiterated this position throughout these proceedings.

court's decision to focus exclusively on the unlikelihood of prosecutorial misconduct. That emphasis led the court to attach no significance to a possible inquiry into the role that a *nongovernmental* actor must have played in the illegal alteration of the document that the state introduced into evidence as exhibit eleven. See General Statutes § 53a-155.

The question before us, then, is whether the record, viewed as a whole, demonstrates, by clear and convincing evidence, that the plaintiff did not act in good faith in initially questioning the role of the state's attorney in the introduction of exhibit eleven into evidence at T's trial and that this conduct was "prejudicial to the administration of justice" in violation of rule 8.4 (4). Our review of the record persuades us that the court's finding cannot be sustained because it fails to attach significance to the totality of the evidence of what transpired in the underlying criminal case. An attorney who, even inartfully, brings the introduction of an altered document to the attention of a court performs a service for the integrity of the judiciary.[26] Accordingly, we grant the plaintiff's writ of error with respect to this disciplinary finding.

IV

Our final inquiry addresses the propriety of the sanctions that the court imposed on the plaintiff. Unpersuaded by the plaintiff's petition not to impose sanctions, the court fined him $100 for each of the four violations of the Rules of Professional Conduct that the court found the plaintiff to have committed. In addition, the court ordered him forthwith to participate in twenty

[26] As for the "significant media attention given counsel's claims," because there is no evidence in the record demonstrating that the plaintiff sought this attention, we cannot conclude, on the basis of this additional observation by the trial court, that the plaintiff's actions were therefore prejudicial to the administration of justice.

hours of continuing legal education, including a class in legal ethics.

Our decision that the evidence of record did not establish the plaintiff's violation of two of the four Rules of Professional Conduct for which he was sanctioned requires us to set aside $200 of the fines that the trial court required the plaintiff to pay. With respect to the court's order for attendance at legal education classes, and enforcement of the remaining $200 fine, we remand the case for a further hearing.[27]

The writ of error is granted in part and the case is remanded to the Superior Court with direction to vacate that part of the order in which that court found that the plaintiff violated rules 1.2 and 8.4 and for further proceedings consistent with this opinion. The writ of error is denied with respect to the court's findings that the plaintiff violated rules 3.1 and 3.3 of the Rules of Professional Conduct.

In this opinion McLACHLAN, J., concurred.

DiPENTIMA, J., concurring in part and dissenting in part. I respectfully dissent from the judgment reached by my colleagues. I agree with the thorough, thoughtful analysis and conclusions of the majority that the plaintiff in error, John F. O'Brien (plaintiff), violated rules 3.1 and 3.3 of the Rules of Professional Conduct. I further join in the majority's opinion that the trial court

[27] Practice Book § 1-22 provides in relevant part: "(a) A judicial authority shall, upon motion of either party or upon its own motion, be disqualified from acting in a matter if such judicial authority is disqualified from acting therein pursuant to Canon 3 (c) of the Code of Judicial Conduct or because the judicial authority previously tried the same matter and a new trial was granted therein or because the judgment was reversed on appeal. A judicial authority may not preside at the hearing of any motion attacking the validity or sufficiency of any warrant the judicial authority issued nor may the judicial authority sit in appellate review of a judgment or order originally rendered by such authority."

improperly found a violation of rule 1.2 of the Rules of Professional Conduct. I disagree, however, that the court improperly found a violation of rule 8.4 of the Rules of Professional Conduct. Accordingly, I respectfully dissent.

As a preliminary matter, I note my agreement with the comprehensive recitation of the factual and procedural history set forth in the majority opinion.[1] On the basis of my review of this history, several key points emerge. First, the plaintiff failed to appreciate the significance of requesting an inquiry pursuant to General Statutes § 54-47c.[2] Although he acknowledged that he was proceeding under the section concerning crimes of corruption involving a member of the state government,[3] the plaintiff stated that he was not accusing the state's attorney of any misconduct. Nevertheless, the effect of requesting the investigatory procedure set forth in § 54-47c was to accuse a state actor of participating in a criminal act.[4] Furthermore, by the use of § 54-47c, as well as citation to the Rules of Professional Conduct,

[1] The plaintiff represented a criminal defendant at trial. The defendant in the underlying criminal matter was acquitted. Her identity, therefore, is not disclosed in this opinion. We refer to the acquittee as T. See General Statutes § 54-142a (a).

[2] At the July 11, 2003 hearing, the court granted the plaintiff's request to make some preliminary remarks, at which time he admitted that T, for whom he had been trial counsel in a prior criminal matter, had several alternative recourses to pursue with respect to the manner in which the state obtained the e-mail in question. "Her recourse is first and foremost, in her opinion and in my opinion, with this court, with Your Honor who presided over the trial of her case. She was not limited to presenting this motion to Your Honor. She has other avenues for different reasons, answers to these questions, including the statewide grievance committee, the office of the chief state's attorney . . . ." Thus, even at the outset, the plaintiff was aware that options other than the use of General Statutes § 54-47c could have been used.

[3] See General Statutes § 54-47b (2).

[4] The trial court aptly stated that "[w]e must be mindful that the request for an investigation pursuant to General Statutes § 53-47c limits our inquiry to the conduct of members of a governmental entity."

coupled with his assorted complaints regarding the conduct of the state's attorney's office,[5] the plaintiff clearly, if not explicitly, implied that a member of the state's attorney's office had tampered with the evidence. The logical corollary to this accusation is that the state actively attempted to obtain a fraudulent conviction. In other words, the plaintiff, whether intentionally or not, alleged very serious charges of misconduct against the office of the state's attorney.

Second, the plaintiff never was able to provide the court with an evidentiary basis to support the claim that an agent of the government had committed a crime.[6] I acknowledge that a comparison of the state's exhibit eleven and T's exhibit F reveal that the document had been altered. Moreover, the belief that a violation of General Statutes § 53a-155, which proscribes tampering with evidence, had occurred certainly was plausible. It does not follow, however, that a government agent was responsible for such tampering with evidence, or knowingly allowed such evidence to be introduced during the criminal trial. Although a significant transgression occurred, namely, the alteration of an e-mail that later

---

[5] I note that the plaintiff complained that the state's attorney's office improperly (1) failed to investigate the origin of the document, (2) failed to consider the attorney-client privilege, (3) used the document in an attempt to impeach the character of T, for whom he had been trial counsel in a prior criminal matter, and (4) failed to disclose the document prior to T's criminal trial.

[6] The court directly asked the plaintiff if he had a good faith basis to believe that the e-mail was tampered with or altered by anyone in the state's attorney's office, the police department or any other governmental entity or agent. The court later asked the plaintiff if he had a good faith basis that a government entity or agent altered the e-mail. After several attempts to avoid that direct question, the plaintiff responded in the affirmative. In my view, this query was not directed at ascertaining the plaintiff's motives or subjective belief regarding misconduct by a government actor, but whether the plaintiff had an objective basis to make such claims. In other words, the court was attempting to determine whether the plaintiff was in possession of evidence that would support his allegations other than his own subjective belief that a state actor was responsible for altering the e-mail.

was admitted into evidence, there was no objective basis for the plaintiff to persist in linking or associating this misconduct with the actions of a member of the state's attorney's office, or any state actor. Simply put, I am in full agreement with the statement of my colleagues that "[t]he plaintiff never presented a factual basis for a reasonable belief that a government entity had altered the e-mail."[7]

Third, there were inconsistencies between the plaintiff's words and actions. For example, on more than one occasion, the plaintiff expressed his belief in the professional integrity of the prosecutor, assistant state's attorney David L. Zagaja. Throughout the entire proceeding, however, the plaintiff lobbed accusations of wrongdoing that necessarily implicated both Zagaja and the office of the state's attorney. Additionally, the plaintiff seemed to acknowledge that if the state would provide an affidavit detailing the manner in which it received the document in question, the need for an investigation would be obviated.[8] Despite receiving such a sworn statement from Zagaja, the plaintiff did not withdraw the request for a § 54-47c investigation. Even after the court denied the plaintiff's request and found that he had violated the Rules of Professional Conduct, in his November 6, 2003 reply, he continued

---

[7] Furthermore, as noted by the majority, the court concluded that there were "no valid reasons" and "no empirical facts" that would afford the court "a reasonable belief that the assistant state's attorney [or] any other attorney or member of a governmental agency . . . had knowledge of, or participated in, the purported deletion of the subject five lines from state's exhibit [eleven]."

[8] At one point, the court asked the plaintiff what would happen if the state had received the e-mail in the exact condition that it was offered into evidence. The plaintiff responded: "That is the answer then, Your Honor. That's the answer. *Then, let the state provide an affidavit to Your Honor that we received it in such a fashion. . . . And then the whole matter— the whole matter is arguably finished,* except for the person who provided a tampered document to the state's attorney." (Emphasis added.)

suggesting misconduct on the part of the state's attorney's office.[9] Finally, although the plaintiff had acknowledged that other methods of investigation could have been used, he advanced the procedure set forth in § 54-47c.

The court's finding that the plaintiff violated rule 8.4 was premised on the fact that his baseless claims called into question the integrity of the state's attorney's office. The court then observed: "Frankly, what caused me more concern—and I can understand how sometimes you might get carried away during a trial. *But what caused me more concern in reading your reply that*

[9] In response to the court's memorandum of decision, the plaintiff submitted a "reply to memorandum of decision and motion not to impose sanctions" on November 6, 2003, in which he continued with the allegations of wrongdoing by a state actor. He argued that the request for an investigation was filed in good faith on a reasonable belief and that he did not intend to "affront the court or the state's attorneys." Nevertheless, he maintained his belief that the document had been altered and that "this procurement by the state was suspect." He further insisted that the introduction of the document during the criminal trial "offended the laws and the principles of justice of this state as well as the constitutional rights of [T]," his client at that trial. The plaintiff implicitly challenged the veracity of Zagaja's affidavit when he stated: "Apart from the state's attorney's affidavit of July 15, 2003, there is no evidence of the origin of the document or how it came into [the former husband's] possession." He continued on this path by questioning the state's representation about the manner in which the state had received the document. The plaintiff indicated that the state's failure to disclose the document "raises reasonable doubts about the state's intentions." He suggested that the tactics employed by the state with respect to the document were unfair because they "intentionally precluded any timely challenge to the state's use of that document." The plaintiff also suggested that the state's attorneys were aware of the former husband's "intense hatred for [T]" and that should have alerted them to a motive and interest in seeing her convicted.

The plaintiff persisted in pursuing an investigation pursuant to General Statutes § 54-47c. "The issues surrounding state's [exhibit eleven] are inextricably linked to government actors who possessed and employed it. A determination of whether or not any state agent acted improperly, unethically or criminally in relation to [exhibit eleven] is what [T] sought. Neither [T] nor I accuse any particular person or governmental entity of wrongdoing; she only believes that wrongdoing occurred within the underlying proceedings . . . in connection with [exhibit eleven]."

*was filed appreciably after the incident when the dust
has settled—I think in November, from July to Novem-
ber—and still—this is what disturbed me. And I know
what disturbed me was the your persistence in these
claims when the law was clearly not on your side."*[10]
(Emphasis added.)

Finally, I share in the concerns set forth by my col-
leagues regarding the introduction of an altered e-mail
into evidence during a court proceeding.[11] However, the
choice of redress and the manner employed by the
plaintiff, by the express language used in § 54-47c, con-
tained an allegation of criminal wrongdoing by a state
actor, most likely a member of state's attorney's office.
Most importantly, the plaintiff's pursuit never yielded,
even when it was clear that there was no evidence
implicating an agent of the government. The choice of
conduct continued despite the opportunity to pursue
other options to discover the source of the alteration.

With these points in mind, I turn my attention to
whether the plaintiff's conduct constituted a violation
of rule 8.4. "[R]ule 8.4 (4) of the Rules of Professional

[10] As I view the record, the court's finding of a violation of rule 8.4 (4)
was premised on the plaintiff's conduct throughout the course of events
and not his "initially questioning the role of the state's attorney . . . ."

[11] The record before us does not indicate whether the state's attorney's
office investigated the circumstances of the altered e-mail in an effort to
uncover the perpetrator. While it is somewhat understandable that the mem-
bers of the state's attorney's office were upset with the accusations leveled
by the plaintiff, I maintain a hope that an equal, if not greater concern, was
that a fraudulent document was introduced, albeit unknowingly, into a
court proceeding by a member of that office. I certainly expect that these
prosecutors would be more concerned with the submission of false evidence
than injury to their professional pride.

Nevertheless, the issue before us is whether there was clear and convinc-
ing evidence to support the court's finding of a violation of rule 8.4 (4).
While I do not totally discount the context in which the plaintiff undertook
his actions, I believe that we must consider the conduct of the plaintiff
separate from the improper and illegal actions of the unidentified person
who provided the state with the altered e-mail.

Conduct . . . prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice . . . . It is well established that members of the bar [must] conduct themselves in a manner compatible with the role of courts in the administration of justice." (Internal quotation marks omitted.) *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 235, 890 A.2d 509, cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006). "Rule [8.4 (4)] overlaps with a large number of the rules in Part 3 of the Rules of Professional Conduct, for almost all of the limits upon advocacy specified in those Rules are designed to protect the integrity of the justice system." 2 G. Hazard & W. Hodes, The Law of Lawyering (3d Ed. 2008 Sup.) § 65.6, p. 65-11. In other words, rule 8.4 is a "catch-all" provision stating general grounds for discipline. See 1 Restatement (Third), Law Governing Lawyers § 5, p. 50 (2000).

I further note that this court has rejected the argument that a violation of rule 8.4 (4) requires the element of intent. In *Daniels* v. *Statewide Grievance Committee*, 72 Conn. App. 203, 210–11, 804 A.2d 1027 (2002), we stated: "Judges no less than lawyers are chargeable for deviations from the codes governing their conduct, even though the application of the canons to particular circumstances may not be readily apparent. . . . *A judge may be sanctioned for a wilful violation of one of the canons of judicial conduct if he intended to engage in the conduct for which he is sanctioned whether or not [he] knows that he violates the rule. . . . That reasoning equally is applicable to lawyers and, therefore, we conclude that the court properly held that rule 8.4 (4) does not have a scienter requirement.* . . . Trial courts that have considered claims of violations of other ethical rules have held that those rules also contain no scienter requirement. See, e.g. . . . . *Gersten* v. *Statewide Grievance Committee*, judicial

district of Hartford-New Britain at Hartford, Docket No. CV-96-0565949 (June 10, 1997) (19 Conn. L. Rptr. 554, 555) (construing Rules of Professional Conduct 1.8 [a] and determining that [i]t is not a defense to an ethical violation that the attorney did not act in bad faith or intend to violate the code) . . . . Although this court is not bound by trial court decisions . . . we agree with their reasoning on the subject and adopt it here." (Citations omitted; emphasis added; internal quotation marks omitted.) See also *Ansell* v. *Statewide Grievance Committee*, 87 Conn. App. 376, 388, 865 A.2d 1215 (2005) ("[f]urthermore, we have held that rule 8.4 [4] does not contain such a requirement [of intent]"). The focus, therefore, is not whether the plaintiff's subjective motivation[12] for calling for a § 54-47c investigation was improper or done in bad faith, but whether his conduct in persisting with such claims without an underlying evidentiary basis violated rule 8.4 (4).

A cursory review of the cases in which a violation of rule 8.4 (4) has been found is appropriate. In *Notopoulos* v. *Statewide Grievance Committee*, supra, 277 Conn. 218, our Supreme Court determined that the statewide grievance committee properly found a violation when an attorney wrote a letter to a member of a probate judge's staff accusing the judge of extorting money for an alleged "crony." In *Daniels* v. *Statewide Grievance Committee*, supra, 72 Conn. App. 207, the attorney was reprimanded after he was found to have violated rule 8.4 (4) by failing to pay in a timely manner the judgment that had been rendered against him. In *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 830, 633 A.2d 296 (1993), the Superior Court ordered the one year suspension of an attorney who had refused on several occasions to attend a pretrial conference in a criminal matter.

---

[12] I note that there is nothing in the record to suggest that the plaintiff acted with animus specifically towards Zagaja or more generally the office of the state's attorney.

As this case law demonstrates, rule 8.4 (4) casts a wide net over an assortment of attorney misconduct. In my view, the plaintiff's persistent and unfounded allegations of criminal behavior by state actors, as demonstrated by his conduct throughout the proceedings, falls within conduct prohibited by rule 8.4 (4). Like the trial court, I am less concerned with the plaintiff's initial use of § 54-47c than with his decision to persevere with this unfounded strategy. The plaintiff' continued to insinuate that members of the state's attorney's office and unnamed state actors had tampered with evidence, despite the lack of a nexus between such individuals and the actual alteration of the e-mail. Despite the plaintiff's contrary belief, mere possession of the e-mail does not equate to the source of the tampering. Accordingly, I believe that the trial court's finding of a violation of rule 8.4 (4) was proper. I would, therefore, deny the writ of error as to that issue.

As a final matter, I now turn to the issue of the propriety of the sanctions against the plaintiff. As I noted at the outset, I am in agreement with the majority that the court properly found violations of rules 3.1 and 3.3. I further agree that the court improperly found a violation of rule 1.2 and would grant the writ of error solely as to that claim. In my view, the monetary sanctions imposed by the court are readily divisible. Accordingly, I would set aside $100 of the fines imposed by the trial court. Finally, I agree with my colleagues that a remand with instructions for the trial court to determine whether the plaintiff should be required to attend a legal education class is proper.

I respectfully concur in part and dissent in part.