DARWIN C. GEBBIE *v.* CADLE COMPANY ET AL.
(AC 16583)

Schaller, Spear and Hennessy, Js.

---

[7] We also conclude that the trial court properly denied the defendant's motion for a new trial.

Argued January 21—officially released June 30, 1998

*Steven M. Basche,* for the appellant (named defendant).

*Lloyd L. Langhammer,* with whom were *Mark E. Block* and, on the brief, *Richard J. Pascal,* for the appellee (plaintiff).

*Opinion*

HENNESSY, J. The named defendant, Cadle Company (Cadle),[1] appeals from the judgment rendered by the trial court in favor of the plaintiff, Darwin C. Gebbie. On appeal, the defendant claims that the trial court improperly (1) concluded that there was a binding and enforceable agreement between the parties, (2) limited the scope of its direct examination of the plaintiff's attorney regarding his impressions of his client's understanding of the terms of the agreement, (3) failed to order that payments on said agreement should have commenced in April, 1995, having found that a binding agreement existed, and (4) found that Cadle had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. We affirm the judgment of the trial court.

The following facts are relevant to the resolution of this appeal and were submitted to the trial court by the parties as stipulated facts. On December 15, 1988, the plaintiff was granted a loan by New England Savings Bank in the amount of $280,000 and secured by a mortgage on property owned by the plaintiff located on Fitchville Road in Bozrah. On December 30, 1992, the plaintiff was granted a loan by New England Savings Bank in the amount of $320,000 and secured by property owned by the plaintiff located on Stockhouse Road in Bozrah.

On May 21, 1993, New England Savings Bank was declared insolvent and the Federal Deposit Insurance

---

[1] We refer in this opinion to the named defendant, Cadle Company, as the defendant.

Corporation (FDIC) was appointed its receiver. Subsequently, the plaintiff's two notes and the mortgages securing them were sold to ALI, Inc. (ALI). In July, 1994, ALI commenced two separate foreclosure actions against the plaintiff, claiming that he had defaulted on the notes.[2] Thereafter, counsel for both parties entered into negotiations, and on March 14, 1995, counsel for ALI, Paul Geraghty, sent a letter agreement to the plaintiff's counsel, Mark E. Block.[3] The terms of the letter agreement were the subject of the underlying civil action. On August 29, 1996, the trial court issued its memorandum of decision in which it made the following findings. The March 14, 1995 letter contained the terms of the agreement between the parties. This letter agreement called for acceptance of the payment from Gebbie by ALI of a nonrefundable deposit in the amount of $4000 within two days. This payment was not mailed until March 28, 1995; however, it was accepted by Geraghty. On March 29, 1995, Geraghty, on behalf of ALI, notified ALI's agent, Fleet Management and Recovery Corporation,[4] that the settlement was "on track and should be consummated soon." On April 20, 1995, Block contacted Geraghty by letter, confirming his client's desire to close the settlement.

[2] The foreclosure action against the Stockhouse Road property was withdrawn by ALI in October, 1995, and the foreclosure action against the Fitchville Road property was dismissed for dormancy by the court in June, 1995.

[3] The letter, addressed to attorney Mark E. Block, stated the following: "This letter shall serve to confirm our conversation of March 13, 1995. ALI will agree to settle its claims with Mr. Gebbie as follows: 1. Payment of $40,000 upon closing with a nonrefundable deposit of $4,000 to be paid within two days hereof. 2. The execution of a promissory note and mortgage modification agreement which will modify the note to $160,000 at 9.5 percent fixed rate on a thirty (30) year amortization payable over a ten (10) year term. The offer must be closed within thirty days hereof unless upon request ALI should agree to an extension thereof. If the note is successfully repaid then said obligations shall be deemed fully satisfied otherwise to remain in full force and effect. Sincerely, //s Paul M. Geraghty."

[4] Fleet was hired by ALI to market the mortgages in its portfolio.

While ALI and Gebbie were negotiating, the plaintiff's notes and mortgages were placed on sale at public auction by ALI through its agents, Fleet Associates and Fleet Management and Recovery Corporation. The information provided to prospective bidders included very specific information regarding the restructuring of the loans. This information mirrored the March 14, 1995 letter. Further, Cadle, the defendant, and other potential bidders were put on notice that the $4000 deposit had been paid and accepted. Cadle made a successful bid in the amount of $151,410 on the plaintiff's loans, which had a total balance of over $600,000.

The plaintiff filed a complaint as a means of forcing performance by either ALI, with whom Gebbie had an agreement, or Cadle, the successor owner of the two Gebbie loans formerly held by ALI. The issues before the trial court were twofold: first, whether ALI and Gebbie had a binding agreement by virtue of the March 15 letter agreement, and second, if so, whether Cadle is bound by the agreement as ALI's successor in interest.

The terms of the letter agreement were as follows: (1) a reduced balance of over $600,000 to $160,000 payable over a ten year term with a thirty year amortization at a stated rate of interest; (2) the total obligations were to be canceled if Gebbie fully complied with the repayment terms; and (3) in the event of default, the full balance would be reinstated. The effect of this agreement was to consolidate the two notes and mortgage obligations and, in consideration of a payment of $40,000, to restructure the agreement. The letter agreement called for acceptance in the form of a $4000 deposit. This deposit was tendered by Gebbie and accepted by ALI. After hearing from the parties, the trial court determined that Cadle had notice that Gebbie and ALI had reached a binding agreement regarding the restructuring of the loans before they closed with ALI.

The trial court found that Gebbie was entitled to specific performance because Cadle was bound by the agreement between ALI and Gebbie. Cadle was ordered to execute a mortgage modification agreement consistent with the March 14, 1995 letter within thirty days of the judgment. The court further found that Cadle violated CUTPA and awarded attorney's fees in the amount of $11,281.25. No portion of the attorney's fees was charged against ALI. Cadle appeals from that judgment.

I

The first issue is whether a binding agreement existed between Gebbie and ALI regarding the restructuring of the loan in order to avoid foreclosure of the property. Cadle admits that as a successor to ALI, it is bound by any agreement made between ALI and Gebbie during the time the loans were owned by ALI.

There is no dispute among the parties that while the loans were owned by ALI, ALI was free to modify the existing loan agreements between itself and Gebbie. The dispute arises because Cadle argues that the parties never reached a binding agreement because there was no meeting of the minds or, in the alternative, that the agreement expired by its own terms because there was no closing within thirty days of the March 14 letter. We conclude that the trial court properly rejected both arguments.

The following additional facts are necessary to the resolution of this claim. Cadle bid on the loan sale agreement with ALI on April 28, 1995. This agreement specifically stated that the buyer, Cadle, did not rely on any separate oral or written representations regarding the loan. On May 5, 1995, the bill of sale between Cadle and ALI was executed, and ownership of the loan transferred from ALI to Cadle.

There is no dispute that the terms of the present agreement were in writing. The trial court determined that the exchange of letters between ALI and Gebbie evidenced their intent to be bound. The trial court concluded that there was mutual consent and a clear intention to be bound by the terms of the modification present in the letter agreement. The trial court found that Cadle was bound by the agreement even though it did not have access to the March 14, 1995 letter because the terms of the agreement between Gebbie and ALI were incorporated in the information available at the time of the sale of the loans. On the basis of those facts, the trial court found that there was mutual consent and a clear intention to be bound by the terms of the modification enunciated in the letter agreement. This conclusion is supported by our case law. See *Giorgio* v. *Nukem, Inc.*, 31 Conn. App. 169, 173–74, 624 A.2d 896 (1993). We conclude that the trial court was correct when it found that ALI and Gebbie had entered into a binding agreement. Accordingly, Cadle is bound by that agreement as ALI's successor in interest.

Turning to the defendant's argument regarding the formation of an agreement, it argues that the agreement is void because it expired on its own terms. Specifically, the defendant asserts that the agreement required the offer to be closed within thirty days. We do not agree. The letter agreement stated "this offer must be closed within thirty days hereof *unless upon request ALI should agree to an extension thereof.*" ALI chose not to enforce this term, however, and therefore waived any right to enforcement of the thirty day closing requirement. "Evidence concerning the intention of the parties may be found in the conduct and language of the parties and the surrounding circumstances." *Giorgio* v. *Nukem, Inc.*, supra, 31 Conn. App. 175. "[T]he extent of the rights so acquired were limited by and no greater than the terms of the contract . . . ." *Heublein, Inc.*

v. *Second National Bank*, 115 Conn. 168, 174, 160 A. 898 (1932). Therefore, as ALI's successor in interest, Cadle is not entitled to greater rights than ALI.

Here, ALI chose to enter into an agreement despite the lapse of more than thirty days. Therefore, ALI evidenced a clear intent to be bound by the agreement despite the lapse in time.

## II

The defendant next argues that the trial court improperly sustained an objection to questions posed to the plaintiff's attorney, Block, on the ground that the answer would violate the attorney-client privilege. The essence of the defendant's position is that because Block answered the same question, without objection, during his pretrial deposition, the attorney-client privilege had been waived and, therefore, he could not invoke the privilege as a shield to the questioning during trial. In response, the plaintiff argues that the liberal nature of the deposition process prevented him from asserting the privilege. We agree with the defendant that the trial court improperly sustained the objection; however, we hold that the error was harmless.

The following additional facts are necessary to the resolution of this issue. On February 12, 1996, Richard J. Pascal, trial attorney for the plaintiff, moved to quash the deposition subpoena of Block to the extent that it had called for notes, memos of correspondence and other documents that are subject to the attorney-client privilege. This motion was not ruled on by the court nor was it pressed by Block. Notwithstanding, Block was deposed by the defendant's attorney. During the deposition, Block made the following statement: "I can tell you this. His understanding was from the course of discussions that had been going on between myself, attorney Geraghty, back and forth, that the $40,000 was going to get him released from that land because it

essentially paid off the value of the land and that the sole remaining mortgage would have been on Perkins Corner."

The trial transcript reveals the following. During the deposition of Block, Gebbie's interests were represented by his attorney, Pascal. Pascal and Block work for the same firm. Block, however, was not represented by Pascal during the deposition. At trial, the defendant called Block to testify as to Gebbie's understanding of the contract. Extensive argument was held before the trial court, *Austin, J.*, regarding the admissibility of Block's testimony.

The plaintiff objected to Block's testimony in any form, asserting that he would not waive his attorney-client privilege and, further, that any relevant testimony would be cumulative because he had already testified as to his understanding of the agreement. In response, the defendant argued that the privilege had already been waived by the client's failure to assert it during the deposition and may not be resurrected. The trial court ultimately ruled that it would allow Block to testify but that it would rule on specific objections as they arose. The defendant then asked the following question: "Attorney Block, as of the date of the March 14 letter, did you have an understanding as to whether Mr. Gebbie knew that the agreement contained a clawback provision?"[5] The plaintiff objected on the ground of attorney-client privilege. This objection was sustained by the trial court, which concluded that pursuant to rule 1.6 of the Rules of Professional Conduct,[6] the attorney-client privilege was in effect because the question posed

---

[5] Block testified that a clawback or callback provision is one where the borrower pays the note in accordance with the revised terms until such time as the adjusted principal has been satisfied. In the event of a default in the payment of the revised terms, the original balance is reinstated.

[6] Rule 1.6 (a) of the Rules of Professional Conduct provides: "A lawyer shall not reveal information relating to representation of a client unless the

went to the heart of the communication between the client and the attorney. While this characterization of the information is correct, we conclude that the privilege was previously waived and, therefore, that the privilege was no longer in effect.

The power to waive the attorney-client privilege rests with the client or with his attorney acting with his authority. 1 C. McCormick, Evidence (4th Ed. 1992) § 93, p. 341; see also *Doyle* v. *Reeves*, 112 Conn. 521, 523, 152 A. 882 (1931) (communications relevant to legal advice privileged until client waives protection). "[I]f the holder of the privilege fails to claim his privilege by objecting to disclosure by himself or another witness when he has an opportunity to do so, he waives his privilege as to the communications so disclosed." 1 C. McCormick, supra, § 93, p. 343. This result is reached because once the confidence protected has been breached, the privilege has no valid "continuing office to perform." Id.

Here, the client's attorney, Pascal, attended the deposition of Block on behalf of the plaintiff to protect the plaintiff's interests. As the plaintiff's agent, it was the responsibility of Pascal to assert the attorney-client privilege. It is clear that no objection was made during the discovery phase when Block was asked about privileged communications he had with his client.[7] Therefore, on behalf of Gebbie, Pascal waived the privilege as to that information for all time.

---

client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation . . . ."

[7] The defendant's argument that the liberal rules of discovery during a deposition require him to answer improper questions and later assert the privilege at trial is unavailing. While it is true that "the allowable scope of inquiry at a discovery deposition clearly exceeds the boundaries of admissible evidence"; *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 139, 491 A.2d 389 (1985); this does not relieve the attorney of the duty to uphold the attorney-client privilege.

We do not take issue with the calling of Block to be deposed per se because it is the duty of a lawyer "to testify as to other matters when called on to do so. We are in accord with the majority rule that the privilege does not extend beyond communications. [*State* v. *Manning*, 162 Conn. 112, 120, 291 A.2d 750 (1971)] . . . See C. Tait & J. LaPlante, [Connecticut Evidence (2d Ed. 1988)] § 12.5.2 [pp. 442–44]." (Internal quotation marks omitted.) *Ullmann* v. *State*, 230 Conn. 698, 712–13, 647 A.2d 324 (1994). Once at the deposition, however, it was Pascal's duty to invoke the privilege or, in the absence of that, waive it. *Miller* v. *Anderson*, 30 Conn. Sup. 501, 504, 294 A.2d 344 (1972) (to be privileged, information must not have been divulged to third party). The trial court correctly determined that the information sought was within the scope of privileged communications;[8] however, it was incorrect when it determined that the privilege remained intact. The remaining question to be answered, therefore, is whether the error was harmful.

The plaintiff argues that the trial court's exclusion of this evidence was harmless because the parol evidence rule would have barred this testimony. That is incorrect. " 'The parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract. *Giorgio* v. *Nukem, Inc.*, [supra, 31 Conn. App. 173–74]); see also 2 Restatement (Second), Contracts § 213 [pp. 129–32] (1981). The rule does not forbid the presentation of parol evidence, but prohibits the use of such evidence to vary or contradict the terms

---

[8] "One of the essential elements of the claim of privilege between attorney and client is that the communication be confidential. *Rienzo* v. *Santangelo*, [160 Conn. 391, 395, 279 A.2d 565 (1971)]; *State* v. *Hanna*, 150 Conn. 457, 466, 191 A.2d 124 (1963). The purpose and effect of the line of questioning by the defendants' counsel during the recross-examination was to have a direct communication between the plaintiff and her counsel revealed. The resort to these questions went beyond the scope of proper recross and was an invasion of the attorney client privilege." *LaFaive* v. *DiLoreto*, 2 Conn. App. 58, 65–66, 476 A.2d 626, cert. denied, 194 Conn. 801, 477 A.2d 1021 (1984).

of the contract. *TIE Communications, Inc.* v. *Kopp*, 218 Conn. 281, 288, 589 A.2d 329 (1991).' " *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 733, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996). The information sought to show that there was no meeting of the minds and, therefore, that no contract in fact existed; it was not intended to contradict the terms of the agreement. See *Foley* v. *Huntington Co.*, supra, 42 Conn. App. 734. Therefore, the parol evidence argument is inapplicable to this case.

We nevertheless conclude that the exclusion of this evidence was harmless error because even if the plaintiff was mistaken as to a term of the contract, this amounts to unilateral mistake insufficient to void the contract under these circumstances. The defendant posits that if the plaintiff failed to understand an essential term of the contract there was no meeting of the minds and, accordingly, no contract. The comments to § 153 of the Restatement (Second), Contracts, state that the party seeking to avoid a contract on the basis of a unilateral mistake must be the party that was mistaken. "In order for a party to have the power to avoid a contract for a mistake that he alone made, he must at least meet the same requirements that he would have had to meet had both parties been mistaken (§ 152). . . . [T]he mistaken party must in addition show that enforcement of the contract would be unconscionable." 1 Restatement (Second), supra, § 153, comments (b) and (c), pp. 394–95. The defendant in this case is not the mistaken party, yet it seeks to assert mistake as a defense to the contract. That it may not do.

In addition, the trial court specifically found that the defendant failed to allege fraud. "[A]ccording to general principles of contract law, rescission based on a mistaken understanding of the terms of an agreement is available only where the mistake is mutual, or where one party's mistake has been caused by the other party's

fraud. See Restatement (2d) of Contracts §§ 152, 153 (1981)."[9] *Hartford* v. *Chase,* 942 F.2d 130, 135 (2d Cir. 1991).

The defendant cites no authority for the proposition that it should be relieved of its contractual obligations because of a claimed unilateral mistake by another party to the contract who does not claim the benefit of such mistake. We find the error to be harmless.

## III

In its September 20, 1996 motion to reargue, the defendant requested that the trial court address "the issue of whether interest is owed on the restructured amount from April, 1995." In response, the court concluded that "payments of principal and interest could not be commenced or made with certainty and safety until the time of the court's decision and, therefore, interest shall commence on August 30, 1996, the date the court's decision was filed." The defendant argues that the trial court improperly declined to order that interest commence on payments due from March 14, 1995, the date of the agreement. We disagree.

It is well established that we will not overrule a trial court's determination regarding an award of interest

---

[9] Our courts frequently look to the Restatement (Second), Contracts for guidance on the law of mistake. " '[I]n private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party . . . unless the contract is voidable on grounds such as mistake, fraud or unconscionability. See 1 Restatement (Second), Contracts §§ 154, 159, and vol. 2, § 208 (1981); cf. *Warner* v. *Pandolfo,* 143 Conn. 728, 122 A.2d 738 (1956).' *Holly Hill Holdings* v. *Lowman,* 226 Conn. 748, [756], 628 A.2d 1298 (1993)." *Gibson* v. *Capano,* 241 Conn. 725, 730–31, 699 A.2d 68 (1997). Section 153 states that "[w]here a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake." 1 Restatement (Second), supra, § 153, p. 394.

absent a clear abuse of discretion. See *Chmielewski* v. *Aetna Casualty & Surety Co.*, 218 Conn. 646, 676, 591 A.2d 101 (1991). Here, the defendant requested that the court award interest on payments due. He asks the court to ignore, however, the pivotal fact that the defendant refused to accept these payments. We conclude that under the facts of this case, there was no abuse of discretion.

## IV

The defendant next claims that the trial court improperly determined that it violated CUTPA. It also claims that the award of attorney's fees was therefore improper. The plaintiff's complaint alleged that Cadle violated § 42-110a et seq. by "(1) failing and refusing to effectuate the settlement agreement and (2) attempting to take the rents in contravention of the agreement." We affirm the trial court's finding that the defendant's actions constituted a violation of CUTPA.[10]

"[I]n determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise— whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen] . . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which

---

[10] CUTPA provides in relevant part that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a).

it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Citations omitted; internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes,* 223 Conn. 80, 105–106, 612 A.2d 1130 (1992).

In this case, the trial court concluded that "Cadle's refusal to honor and effectuate the loan restructure agreement and its related conduct, including failing to release the foreclosure attachments and lis pendens, constituted a violation of [CUTPA]." The court took particular note of the "clear acknowledgment that [Cadle] stepped into the shoes of [ALI] with full knowledge of the agreement by Cadle." The record clearly supports this conclusion.

Cadle openly acknowledges the existence of an agreement by which it is bound yet refuses to honor. Its actions forced the plaintiff to seek redress in the courts to have the agreement enforced. This is the type of behavior that CUTPA seeks to discourage. See *Murphy* v. *McNamara,* 36 Conn. Sup. 183, 416 A.2d 170 (1979); see also *Bailey Employment System, Inc.* v. *Hahn,* 545 F. Sup. 62 (D. Conn. 1982), aff'd, 723 F.2d 895 (2d Cir. 1983). We affirm the trial court's finding that a CUTPA violation occurred.

As to the issue of attorney's fees, "[t]he public policy underlying CUTPA is to encourage litigants to act as private attorneys general and to engage in bringing actions that have as their basis unfair or deceptive trade practices. . . . In order to encourage attorneys to accept and litigate CUTPA cases, the legislature has provided for the award of attorney's fees and costs. . . . Once liability has been established under CUTPA,

attorney's fees and costs may be awarded at the discretion of the court. . . . . We will not interfere with the trial court's exercise of this discretion unless there is manifest abuse or injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *Jacques All Trades Corp.* v. *Brown*, 42 Conn. App. 124, 130–31, 679 A.2d 27 (1996), aff'd, 240 Conn. 654, 692 A.2d 809 (1997). Under facts of this case, we find that the award of attorney's fees was proper.

The judgment is affirmed.

In this opinion the other judges concurred.