******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# COLONIAL INVESTORS, LLC *v.* LOIS FURBUSH ET AL.
## (AC 38303)

DiPentima, C. J., and Alvord and Schaller, Js.

*Syllabus*

The plaintiff owner of a mobile home park sought, by way of summary process, to regain possession of certain premises leased to the defendant in connection with the defendant's alleged nonpayment of rent. The defendant alleged several special defenses, including that the notice to quit was legally insufficient, that certain charges assessed by the plaintiff were improperly treated as part of her rent and thereby improperly increased the amount of her arrearage, and that the plaintiff had misapplied a payment to the defendant's arrearage rather than to her current monthly rental obligation. The trial court rendered a judgment of possession in favor of the plaintiff, from which the defendant appealed to this court. She claimed, inter alia, that the trial court lacked subject matter jurisdiction due to the legal insufficiency of the notice to quit. *Held*:

1. The defendant could not prevail on her claim that the notice to quit was legally insufficient because it failed to inform her clearly of her statutory (§ 21-80) right to avoid eviction by paying the total arrearage due within thirty days of receipt; the notice to quit clearly specified the total arrearage due and adequately informed the defendant of her right to avoid eviction by paying the total arrearage due within thirty days of receipt, and the disclaimer in the notice to quit that any partial payments would be accepted for use and occupancy only and not for rent was substantially similar to the use and occupancy disclaimer set forth in the general summary process statute (§ 47a-23 [e]), which applied to mobile home parks pursuant to § 21-80 (a), and, therefore, was not misleading or ambiguous.

2. The defendant could not prevail on her claim that the trial court improperly determined that it did not need to decide her second special defense, in which she alleged that the plaintiff improperly imposed customer service charges for utilities as rent and that the plaintiff's charges for utilities in excess of the defendant's usage were illegal and could not serve as a basis for an eviction for nonpayment of rent: that court, which concluded that it did not need to find that the surcharges for the utilities were excessive or against public policy because, even if they were not enforced, there would still be an arrearage at the time that the notice to quit was served, in effect rejected the defendant's second special defense as a basis for attacking the legal sufficiency of the notice to quit; moreover, on the basis of the plain and unambiguous language of the parties' renewal rental agreement and the accompanying documents related to the defendant's billing, the customer service charges were properly included as a component of the rent billed to the defendant, and, therefore, the past arrearage due in the notice to quit was correct.

3. The trial court properly rejected the defendant's claim in her second special defense that the notice to quit included improper water charges and, thus, was legally insufficient, which was based on her claim that the plaintiff had engaged in illegal submetering in violation of the state regulation (§ 16-11-55) that requires that submetering of water be approved by the state Public Utilities Commission; that court properly determined that the plaintiff submetered water from the Metropolitan District Commission, which, by the plain language of the relevant statute (§ 16-1 [a] [6]), was not subject to that regulation, and, therefore, the notice to quit was not legally insufficient on that basis.

4. The trial court properly determined that the defendant's April, 2014 payment was correctly applied to a past arrearage that was due rather than to her current monthly rental obligation; because each monthly statement given to the defendant included any balance remaining from the previous month, and because the defendant often tendered payments exceeding her monthly rental obligation, which lowered her past arrearage due, it was clear from the parties' course of performance that the defendant was aware that her payments were applied first to her total arrearage due and then to her current rental obligation.

Argued February 1—officially released August 1, 2017

*Procedural History*

Summary process action, brought to the Superior Court in the judicial district of Hartford, Housing Session, where the court, *Woods, J.*, denied the named defendant's motion to dismiss; thereafter, the matter was tried to the court; judgment for the plaintiff, from which the named defendant appealed to this court; subsequently, the court, *Woods, J.*, denied the named defendant's motion for an articulation. *Affirmed.*

*David A. Pels*, with whom, on the brief, was *Giovanna Shay*, for the appellant (named defendant).

*Colin P. Mahon*, with whom was *Thomas T. Lombardo*, for the appellee (plaintiff).

*Opinion*

SCHALLER, J. The defendant Lois Furbush[1] appeals from the judgment of the trial court in favor of the plaintiff, Colonial Investors, LLC, in this summary process action. On appeal, the defendant claims that the trial court (1) lacked subject matter jurisdiction over the summary process action due to the legal insufficiency of the notice to quit and (2) improperly held that the defendant's April, 2014 payment to the plaintiff correctly was applied to her past arrearages that were due rather than to her April, 2014 rent obligation. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the defendant's appeal. The plaintiff owns a mobile home site in East Hartford known as Colonial Mobile Home Park (park). The plaintiff leases the 460 lots in the park to tenants who own mobile homes. In August 2012, the defendant, who owned and occupied a mobile home, signed a one year rental agreement for a lot, and, in August, 2013, the defendant signed a renewal of rental agreement (renewal) for an additional year. Pursuant to the rental agreement and renewal, the defendant was to pay a base rent of $420, as well as additional rent, which included utility charges for kerosene, propane, and water.

By January, 2013, the defendant was in arrears on her monthly rent payments. As of April 1, 2014, the defendant had an outstanding arrearage of $1615.13. This included base rent and additional rent. On April 11, 2014, the defendant made a $600 payment to the plaintiff, which was applied to the outstanding arrearage. After said payment, the defendant had a remaining balance of $1015.13.

On April 30, 2014, the plaintiff served the defendant with a notice to quit possession of the premises on or before June 2, 2014. The ground stated in the notice was for nonpayment of rent totaling $1015.13. Pursuant to the notice to quit, the defendant could avoid eviction should she pay the total arrearage due within thirty days of receipt of the notice. The defendant, however, did not tender any payment to the plaintiff within the thirty days.

Thereafter, on June 13, 2014, the plaintiff commenced this summary process action. In its one count amended complaint, the plaintiff alleged that the defendant failed to pay rent for the month of April, 2014, failed to tender the total arrearage due to the plaintiff following the receipt of the notice to quit, and subsequently failed to quit possession of the premises by the time designated in the notice to quit. On June 30, 2014, the defendant filed a motion to dismiss for lack of subject matter jurisdiction on the ground that the notice to quit was legally insufficient. The trial court denied the motion on July 23, 2014.

On October 14, 2014, the defendant filed an answer and special defenses. The first special defense alleged that the defendant tendered, and the plaintiff accepted, rent for the month of April, 2014, prior to the delivery of the notice to quit. The second special defense alleged that the plaintiff submetered water at the park without the necessary approval required by § 16-11-55 of the Regulations of Connecticut State Agencies. The third special defense alleged that the notice to quit was legally insufficient in that it did not state correctly the rent due for April, 2014. After a trial before the court, the trial court issued a written decision on August 21, 2015, in which it rendered judgment of possession of the premises for the plaintiff. The defendant then filed this appeal. Additional facts will be set forth as necessary.

Before addressing the specifics of the defendant's claims, it is helpful to identify the legal principles regarding summary process actions. "Summary process is a special statutory procedure designed to provide an expeditious remedy. . . . It enable[s] landlords to obtain possession of leased premises without suffering the delay, loss and expense to which, under the common-law actions, they might be subjected by tenants wrongfully holding their terms. . . . Summary process statutes secure a prompt hearing and final determination. . . . Therefore, the statutes relating to summary process must be narrowly construed and strictly followed." (Internal quotation marks omitted.) *Sullivan* v. *Lazzari*, 135 Conn. App. 831, 835, 43 A.3d 750, cert. denied, 305 Conn. 925, 47 A.3d 884 (2012).

I

The defendant first claims that the trial court lacked subject matter jurisdiction over the summary process action because the notice to quit was legally insufficient. Specifically, she argues that the notice to quit failed to inform her clearly of her right to avoid eviction by paying the total arrearage due within thirty days of receipt. Moreover, she argues that the trial court improperly failed to consider her special defenses that the customer service charges were imposed improperly as rent and that the water was submetered illegally, which led to the significant inflation of the past arrearage due as stated in the notice to quit.

Our Supreme Court previously has articulated the standard for "reviewing challenges to the trial court's subject matter jurisdiction in a summary process action on the basis of a defect in the notice to quit. Before the [trial] court can entertain a summary process action and evict a tenant, the owner of the land must previously have served the tenant with a notice to quit. . . . As a condition precedent to a summary process action, proper notice to quit . . . is a jurisdictional necessity. . . . This court's review of the trial court's determination as to whether a notice to quit served by the plaintiff

effectively conferred subject matter jurisdiction is plenary." (Citations omitted; internal quotation marks omitted.) *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 388, 973 A.2d 1229 (2009).

The requirements for a notice to quit in a summary process action involving a mobile home is governed by General Statutes § 21-80 (b) (3). "Notwithstanding the provisions of [General Statutes] § 47a-23,[2] the general summary process statute, when a tenant, as in this case, breaches her lease by failing to pay rent, and the landlord seeks to terminate the tenancy, the landlord must follow the procedures enunciated in § 21-80 (b) (3) (B).[3] . . . [U]nder the plain language of § 21-80 (b) (3) (B), the prerequisites to the maintenance of a summary process action for nonpayment of rent are a written thirty day notification to the tenant and a statement of the total arrearage due." (Footnotes added.) *Ossen* v. *Kreutzer*, 19 Conn. App. 564, 568–69, 563 A.2d 741 (1989).

### A

We begin with the defendant's claim that the use and occupancy disclaimer included in the notice to quit was not a clear notification of the defendant's right pursuant to § 21-80 to avoid eviction by making full payment of past arrearage due within thirty days of receipt. The defendant argues that, because the plaintiff did not comply with the requirements of § 21-80, the trial court lacked subject matter jurisdiction.

The following facts and procedural history are relevant to this claim. The notice to quit included the following disclaimer: "ANY PARTIAL PAYMENTS TENDERED WILL BE ACCEPTED FOR USE AND OCCUPANCY ONLY AND NOT FOR RENT, WITH FULL RESERVATION OF RIGHTS TO CONTINUE WITH THE EVICTION ACTION IF THE TOTAL OF ALL PARTIAL PAYMENTS MADE WITHIN 30 DAYS OF RECEIPT OF THIS NOTICE DOES NOT EQUAL THE TOTAL ARREARAGE STATED ABOVE. **ALL PAYMENTS SHOULD BE MADE TO THE ATTORNEY'S OFFICE AND NOT TO THE LANDLORD.**" (Emphasis in original.) In its motion to dismiss, the defendant argued that the notice to quit failed to meet the requirements of § 21-80 because it did not indicate that the defendant could avoid eviction by paying the past arrearage due. The trial court denied the defendant's motion to dismiss, finding that the notice to quit satisfied the requirements of § 21-80.

"Under [§ 21-80 (b) (3) (B)], to effectuate the termination [of a tenancy for nonpayment of rent] the landlord must give the resident thirty days written notice and that notice must state the total arrearage due. If the tenant tenders the total arrearage due within the thirty day notice period provided in this section, the landlord 'shall not maintain or proceed with the summary process action.' General Statutes § 21-80 (b) (3) (B). The

purpose for reciting the total arrearage due in the notice is to afford the tenant a final opportunity to save the tenancy by tendering the total arrearage within the thirty day grace period. If tender is made within the grace period, the statute bars further action by the landlord." *Ossen* v. *Kreutzer*, supra, 19 Conn. App. 568.

In the present action, the notice to quit clearly specified the total arrearage due; it stated that the defendant owed rent of $834.09 for April, 2014, the balance of $160.04 for March 2014 rent, and a late fee of $21, for a total of $1015.13. The use and occupancy disclaimer then provided the required notice period; it made clear that the defendant had a thirty day grace period in which she could make payments totaling the past arrearage due in order to avoid eviction. Specifically, the disclaimer stated that the plaintiff reserved the "rights to continue with the eviction action if the total of all partial payments made within 30 days of receipt of this notice does not equal the total arrearage stated above."

The defendant, however, claims that the use and occupancy disclaimer was not a clear statement of this grace period, but rather a misleading statement that discouraged her from tendering payment. With regard to the appropriate language for a use and occupancy disclaimer, § 21-80 does not provide any guidance. Pursuant to § 21-80 (a), however, the provisions for summary process in mobile home parks are in addition to the provisions for summary process under chapter 832, unless otherwise specified.[4] Section 47a-23, which falls under chapter 832, provides an example of a use and occupancy disclaimer, and, therefore we may examine it in relation to the disclaimer in the present case. Accordingly, § 47a-23 (e) provides that: "[A use and occupancy] disclaimer shall be in substantially the following form: 'Any payments tendered after the date specified to quit possession or occupancy, or the date of the completion of the pretermination process if that is later, will be accepted for use and occupancy only and not for rent, with full reservation of rights to continue with the eviction action.' " The use and occupancy disclaimer in the present case is substantially similar to that in § 47a-23 (e), clearly indicating that future payments by the defendant will be accepted for use and occupancy, not as rent, but that such payments may help the defendant avoid eviction should the total of her payments equal her past arrearage due of $1015.13.

In addition, the defendant claims that the disclaimer lacks clarity because it is a sentence of over fifty words with a double negative. Specifically, the defendant suggests that the phrases "and not for rent" and "does not equal" create a double negative. With regard to the phrase "and not for rent," the inclusion of the word "not" is to indicate to the defendant that all payments

tendered will be accepted *not* for rent, but rather for use and occupancy only. The same language can be seen in the suggested disclaimer found in § 47a-23 (e). With regard to the phrase "does not equal," the inclusion of the word "not" is to indicate that, if the defendant makes payments within thirty days of receipt of the notice, but these payments do *not* equal the past arrearage due, the defendant cannot avoid eviction. In neither context does the inclusion of the word "not" create a double negative. We therefore determine that there is no ambiguity regarding the language used in the use and occupancy disclaimer. Accordingly, we conclude that the notice to quit was legally sufficient in this regard.

B

The defendant next claims that the trial court improperly determined that it need not decide the defendant's claims alleged in the second and third special defenses that the past arrearage due in the notice to quit was incorrect, thereby causing the notice to be legally insufficient pursuant to § 21-80 and consequently depriving the trial court of subject matter jurisdiction. Specifically, the defendant claims that the trial court improperly held that it need not decide whether the plaintiff imposed customer service charges for the utilities as rent in violation of the parties' rental agreement.[5] Furthermore, the defendant claims that the trial court improperly held that it need not decide whether the plaintiff engaged in submetering in violation § 16-11-55 of the Regulations of Connecticut State Agencies, which led to the inclusion of improper water charges in the past arrearage due.

The following facts and procedural history are relevant to the defendant's claim. Pursuant to the renewal, kerosene, propane, and water "will be billed . . . based on the usage at the rate posted in the park office . . . . Except for the . . . delineated rental payments and the utility charges [provided in § 3 of the renewal], the [plaintiff] shall not collect any service charges . . . unless itemized in billing to Resident and authorized elsewhere in this [r]ental [a]greement. Any charges or expenses assessed under the provisions of this [r]ental [a]greement or the [r]ules and [r]egulations of the [p]ark shall be paid to the [plaintiff] as additional rent . . . ." As part of additional rent, the defendant was billed for all kerosene usage, plus an additional $.70 per gallon of kerosene used; all propane usage, plus an additional $.45 per gallon of propane used; and all water usage, plus a $40.40 quarterly customer service charge. The monthly statements sent to the defendant included individual charges for kerosene and propane, and two distinct water charges, one for usage and one for the customer service charge.

With respect to water usage, the Metropolitan District Commission (MDC) supplies the water to the park. Spe-

cifically, MDC delivers the water to the master meter at the park. From the master meter, the plaintiff distributes the water to individual meters located on each of the occupied lots. The trial court heard evidence that the individual meters measure the water usage at each individual lot. These readings are recorded and sent to the park's corporate offices where bills are generated. The tenants are billed quarterly for water, and the total owed is comprised of actual water usage as measured by the individual meter and a quarterly customer service charge of $40.40. The plaintiff collects payment from the tenants and pays the usage portion of the bill to the MDC. The plaintiff retains the quarterly customer service charge to cover the cost of maintaining the water system that connects the MDC master meter to the individual meters.

Generally, in determining whether a court lacks subject matter jurisdiction, the inquiry does not extend to the merits of the case. See *Lampasona* v. *Jacobs*, 209 Conn. 724, 728, 553 A.2d 175, cert. denied, 492 U.S. 919, 109 S. Ct. 3244, 106 L. Ed. 2d 590 (1989). In *Lampasona*, however, our Supreme Court, in considering whether the trial court lacked subject matter jurisdiction over a summary process action, determined that an examination of the facts was necessary. Id. Specifically, the court determined that, because proper notice to quit is a jurisdictional necessity for a summary process action, and the defendant in that case claimed that the notice to quit complied with the inapplicable general summary process provision rather than the applicable mobile home summary process provision, the court was required to determine which provision applied. Id., 726, 730. To resolve which provision applied, the court had to examine the facts of the case to determine whether the defendant was a resident of the plaintiff's mobile home park. Id., 730. In the present case, the defendant claims that the trial court lacked subject matter jurisdiction because the notice to quit was defective for failure to state properly the total arrearage due. The dispositive question in determining if the arrearage was stated properly is whether the customer service charges and water charges constituted rent, and, therefore, an examination of the facts is necessary.

1

We first address the defendant's claim that the trial court improperly held that it did not need to decide whether, as alleged in the defendant's second special defense, the plaintiff improperly imposed customer service charges for utilities as rent, in violation of the parties' rental agreement. Specifically, the court held: "The defendant's second special defense is that the plaintiff's charges for utilities in excess of the tenant's usage [are] illegal and therefore cannot serve as the basis for an eviction for nonpayment of rent. The court does not need to find that the surcharges for the utilities

are excessive and against public policy . . . because even if the surcharges are not enforced, there would still be an arrearage at the time that the notice to quit was served." Therefore, although the defendant argues that the trial court did not decide her second special defense, the record shows that the court essentially rejected the second special defense as a basis for attacking the legal sufficiency of the notice to quit due to the existence of an arrearage apart from the challenged surcharges. Nevertheless, we conclude that the customer service charges were a proper component of the rent billed to the defendant.

"In construing a written lease . . . three elementary principles must be [considered]: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; [and] (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible." (Internal quotation marks omitted.) *Elliott Enterprises, LLC* v. *Goodale*, 166 Conn. App. 461, 469, 142 A.3d 335 (2016).

The defendant claims that the rental agreement and renewal[6] did not contain an agreement that the defendant would pay utility charges beyond actual usage. The facts and the evidence before the trial court, however, do not support the defendant's position. The plaintiff treated as rent the "base rent in equal monthly installments" pursuant to § 3 (B) and "additional rent" pursuant to § 3 (C) of the renewal. Under the clear language of § 3 (C) of the renewal, all utilities are billed based on usage, and the rates at which they are billed are posted in the park office. The renewal and rental agreement do not mention the customer service charges related to each utility. Section 3 (D)[7] of the renewal, however, states that service charges may be collected if they are itemized in billing to the tenant and authorized elsewhere in the rental agreement. Section 5 (A) (6) of the rental agreement states that the plaintiff is to maintain all utilities provided by it, and § 5 (A) (7) specifically states that the plaintiff is to maintain all water lines and connections.

Recognizing that, when construing the renewal and rental agreement as a whole rent consists of multiple components, we conclude that the customer service charges billed to the defendant were not in violation of the rental agreement. Although the customer service charges were not listed specifically as additional rent in § 3 (C) of the renewal, they were authorized as additional rent through § 3 (D) of the renewal and § 5 of the rental agreement, for they were customer service charges that were a necessary part of maintaining the utilities and the water system. The details of how the

customer service charges were calculated into the billing of utilities were provided to the defendant in utility rate notices sent to all residents of the park. The utility rate notices confirmed that the billing rates also would be posted in the park office, as stipulated in the renewal.

Moreover, the defendant's monthly statements itemized these customer service charges. Each monthly statement given to the defendant provided individual utility details for kerosene, propane, and water. For kerosene and propane, the rate at which usage was billed included the customer service charges. The inclusion of the charge in the rate was stipulated in the utility rate notices sent to the tenants. The total billed each month for propane and kerosene match the monthly entries in the plaintiff's ledgers. With regard to the water charges, a quarterly customer service charge was listed consistently under the water detail in the defendant's monthly statements. The customer service charge, however, was only included in the monthly balance due every three statements. These charges coincide with the plaintiff's ledgers, which included water charges every three entries. On the basis of the plain and unambiguous language in the renewal, rental agreement, and the accompanying documents related to the defendant's billing, the customer service charges were a proper component of the rent billed to the defendant, and, therefore, the past arrearage due in the notice to quit was correct. Consequently, this challenge to the legal sufficiency of the notice to quit fails.

2

We next address the defendant's claim that the trial court improperly held that it need not decide whether the plaintiff engaged in illegal submetering as alleged in her second special defense. Specifically, the defendant argues that the plaintiff engaged in submetering in violation of § 16-11-55 of the Regulations of Connecticut State Agencies because that regulation requires that submetering be approved by the state Public Utilities Commission (commission), and the MDC does not have such approval.[8] As a result, the defendant claims that the notice to quit was legally insufficient, for the total arrearage stated was inflated significantly by the inclusion of improper water charges.

We first note that the trial court did make a determination with regard to this aspect of the defendant's special defense. Specifically, the trial court held that the MDC was a water company that was not regulated by the Public Utilities Regulatory Authority (PURA), the authority under which § 16-11-55 was promulgated, and, therefore, it rejected the special defense.[9] We further conclude that the trial court properly rejected the defendant's special defense.

This issue of whether § 16-11-55 of the Regulations

of Connecticut State Agencies applies to the MDC presents a question of statutory interpretation. "Administrative rules and regulations are given the force and effect of law. . . . We therefore construe agency regulations in accordance with accepted rules of statutory construction." (Citations omitted; internal quotation marks omitted.) *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 751, 865 A.2d 428 (2005). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z[10] directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Footnote in original; internal quotation marks omitted.) *In re William D.*, 97 Conn. App. 600, 606, 905 A.2d 696 (2006), aff'd, 284 Conn. 305, 933 A.2d 1147 (2007).

We begin our analysis with the governing statute and its accompanying regulation. Pursuant to General Statutes § 16-1 et seq., public service companies, including water companies, are regulated by PURA. A water company includes "every person owning, leasing, maintaining, operating, managing or controlling any pond, lake, reservoir, stream, well or distributing plant or system employed for the purpose of supplying water to fifty or more consumers," but it does *not* include "a municipal waterworks system established under chapter 102, a district, metropolitan district, municipal district or special services district established under chapter 105, chapter 105a or any other general statute of any public or special act which is authorized to supply water . . . ." General Statutes § 16-1 (a) (6). Pursuant to this statutory authority, PURA promulgated § 16-11-55 of the Regulations of Connecticut State Agencies, subdivision (4) of which requires a public service company to receive the approval of the commission to submeter.

The MDC was created in 1929 by a special act of the Connecticut General Assembly, which declares that the MDC is a metropolitan district within the county of Hartford formed to provide water and sewage services. 20 Spec. Acts 1204, No. 511, § 1 (1929);[11] see *Rocky Hill*

*Convalescent Hospital, Inc.* v. *Metropolitan District*, 160 Conn. 446, 450, 280 A.2d 344 (1971). As a metropolitan district established through a special act, the MDC falls within the exception set forth in § 16-1 (a) (6). Thus, the MDC was not required to receive approval from the commission to submeter at the park. Accordingly, the trial court properly rejected the defendant's special defense that the MDC's submetering of the water was in violation of § 16-11-55 of the Regulations of Connecticut State Agencies.

We conclude that the notice to quit was legally sufficient. Accordingly, the trial court properly assumed jurisdiction over the summary process action.

II

The defendant further claims that the trial court improperly determined that her April, 2014 payment was applied correctly to the past arrearage instead of her April, 2014 rent obligation. Specifically, the defendant argues that no evidence was presented that standard practice between the parties was to have payments applied to the past arrearage due before the current monthly obligation. Rather, the defendant argues that this was an uncommunicated, unilateral practice of the plaintiff.

The following facts and procedural history are relevant to the defendant's claim. The trial court heard evidence that, if a tenant is in arrears, the custom of the plaintiff is to apply any payment by the tenant to the arrearage first. The tenants are not specifically notified as to how their payments are being applied, but the practice is memorialized through the monthly statements that tenants are given. The plaintiff's ledgers also reflect this practice. As recorded in the plaintiff's ledgers, as of April, 2014, the defendant owed a balance of $1615.13. On April 11, 2014, the plaintiff recorded in its ledger a $600 payment made by the plaintiff, which left a balance of $1015.13. Said payment also was reflected in a statement provided to the defendant.

Whether the defendant's April, 2014 payment properly was applied to the past arrearage due is a mixed question of law and fact. "Questions of law mixed with questions of fact receive plenary review." *Duperry* v. *Solnit*, 261 Conn. 309, 318, 803 A.2d 287 (2002). "When a debtor has two or more obligations to the same creditor, the debtor possesses the power to direct the manner in which his payment is to be applied. . . . The obligor must manifest his direction to the obligee, but he need not manifest it in words. A direction may be inferred from other circumstances, including the performance itself. It is often clear from the nature of the performance that it is to be applied to a particular duty." (Citation omitted; footnote omitted; internal quotation marks omitted.) *South Sea Co.* v. *Global Turbine Component Technologies, LLC*, 95 Conn. App. 742, 750–51,

899 A.2d 642 (2002).

Applying the reasoning of *South Sea Co.* to the present case, we may consider the defendant's conduct, the parties' course of performance, and the defendant's failure to give a contrary direction in determining the proper application of the April, 2014 payment. Each monthly statement given to the defendant included any balance remaining from her previous month, thus providing her with the past arrearage due. By the time that the defendant's April, 2014 payment was made, the defendant had received numerous monthly statements and tendered payments based on the amount identified in each statement as due. On many of these occasions, the payments tendered exceeded the monthly rent and thus further lowered her past arrearage due. Consequently, it may be inferred that the defendant was aware that her payments were applied first to her total arrearage due and then to her current monthly obligation. Despite the defendant's having knowledge of the manner in which the payments were applied, nothing in the record suggests that she gave the plaintiff direction to apply the April, 2014 payment first to the April rent obligation instead of the past arrearage due. Because nothing suggests that the defendant gave direction to the plaintiff, either actually or inferentially, we conclude that the trial court properly determined that the defendant's April, 2014 payment was correctly applied to the past arrearage due rather than to her April, 2014 rent obligation.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Although the plaintiff's amended complaint originally named Lois Furbush and Piper Goehring as defendants, the plaintiff subsequently moved for default against Goehring for failure to appear, which the court granted on June 1, 2016, and she has not participated in this appeal. We therefore refer to Furbush as the defendant.

[2] General Statutes § 47a-23 is the general summary process statute that governs the form and delivery of notices to quit possession, whereas § 21-80 is the provision specific to mobile home summary process actions. See *Lampasona* v. *Jacobs*, 209 Conn. 724, 726, 553 A.2d 175, cert. denied, 492 U.S. 919, 109 S. Ct. 3244, 106 L. Ed. 2d 590 (1989).

[3] General Statutes § 21-80 (b) (3) provides in relevant part: "Notwithstanding the provisions of section 47a-23, termination of any tenancy in a mobile manufactured home park shall be effective only if made . . . (B) By the owner giving the resident at least sixty days' written notice, which shall state the reason or reasons for such termination, except that, when the termination is based upon subparagraph (A) of subdivision (1) of this subsection, the owner need give the resident only thirty days' notice, which notice shall state the total arrearage due provided, the owner shall not maintain or proceed with a summary process against a resident who tenders the total arrearage due to the owner within such thirty days . . . ."

General Statutes § 21-80 (b) (1) provides in relevant part: "[A]n owner may terminate a rental agreement or maintain a summary process action against a resident who owns a mobile manufactured home . . . for . . . (A) Nonpayment of rent, utility charges or reasonable incidental service charges . . . ."

[4] General Statutes § 21-80 (a) provides in relevant part: "An action for summary process may be maintained by the owner of a mobile manufactured home park against a mobile manufactured home resident who rents a mobile manufactured home from such owner for the following reasons, which shall be in addition to other reasons allowed under chapter 832, and, except as

otherwise specified, proceedings under this subsection shall be as prescribed in chapter 832 . . . ."

[5] On appeal, the defendant initially argued that the customer service charges were imposed as rent in violation of the parties' lease agreement and General Statutes § 47a-4 (a) (9). The defendant, pursuant to Practice Book § 67-10, subsequently withdrew § 47a-4 (a) (9) from her argument on the premise that General Statutes § 47a-2 (b) excludes from § 47a-4 (a) (9) mobile home owners who own their mobile homes but rent the lots on which the homes are situated.

[6] The renewal substituted § 3 of the rental agreement, but otherwise incorporated all of the terms of the rental agreement.

[7] In the renewal, the subsection of § 3 discussing service charges is labeled "A." The subsection is mislabeled, however, and should be labeled "D," as provided in § 3 of the rental agreement. Therefore, we refer to the subsection of the lease addressing customer service charges as § 3 (D).

[8] The defendant also argues that the water customer service charge was an unfair or deceptive trade practice within the meaning of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and, therefore, its inclusion in the rent was improper. "[A] violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Internal quotation marks omitted.) *Gebbie* v. *Cadle Co.*, 49 Conn. App. 265, 279, 714 A.2d 678 (1998). In her brief, the defendant merely states that the discrepancy between what the plaintiff collects from its tenants and what it owes to the MDC is enormous, and that the plaintiff deceives its residents by billing a customer service charge on the claim that it is related to MDC charges. No further analysis is given. Accordingly, we only address the illegality of submetering as to the applicability of § 16-11-55 of the Regulations of Connecticut State Agencies, which the defendant adequately briefed and argued before this court. See *Strobel* v. *Strobel*, 73 Conn. App. 488, 490, 808 A.2d 1138 ("[w]e consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" [internal quotation marks omitted]), cert. denied, 262 Conn. 928, 814 A.2d 383 (2002).

[9] The trial court also held that "[a] per se violation of this regulation, without more, would not rise to the level of a special defense in this action because the court finds that the charges for water usage (not the quarterly customer service charge) were reasonable."

[10] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[11] The act provides in relevant part: "There shall be within the county of Hartford a *metropolitan district* with territorial limits as hereinafter more particularly defined. All the inhabitants and electors of the towns composing said metropolitan district are constituted and declared, upon the taking effect of this act as hereinafter provided, body politic and corporate by the name of The Metropolitan District . . . ." (Emphasis added.) 20 Spec. Act 1204, No. 511, § 1 (1929).